UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

**UNITED STATES OF AMERICA,**  CASE NO. 24-CR-20382-DPG-1

    **Plaintiff,**

vs.

**ZACHARY KAMERON RAMYARD,**

    **Defendant,**
_____/

**DEFENDANT, ZACHARY KAMERON RAMYARD'S
MOTION FOR DOWNWARD VARIANCE PURSUANT TO THE
TITLE 18 U.S.C. §3553(a) FACTORS AND FOR CONCURRENT SENTENCING**

**COMES NOW** the Defendant, **ZACHARY KAMERON RAMYARD** (hereinafter also referred to as "Mr. Ramyard"), by and through his undersigned counsel, and presents herewith, his Motion for Downward Variance pursuant to the Title 18 U.S.C. §3553(a) Factors and for Concurrent Sentencing, and states as follows:

**INTRODUCTION**

At the start, it should be clear that Zachary Kameron Ramyard is sincerely remorseful for his criminal conduct and acknowledges that the offense to which he has entered his plea of guilty is of a serious nature. Further, he wholly realizes the impact his decision to become involved in this criminal conduct as well as his earlier criminal conduct will have upon his family and his future, and knows that he has nobody to blame but himself. Mr. Ramyard fully accepts responsibility for his conduct as discussed below.

The United States Supreme Court has stated that Federal sentencing demands that every convicted person be treated as an individual and "every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and punishment to ensue." *Gall v. United States*, 128 S.Ct. 586, 589 (2007).

There is one point counsel believes this Court should consider closely. That is the fact that in August of 2020, when the criminal conduct commenced, Zachary Ramyard had just turned nineteen (19) years of age, and when the criminal conduct concluded in August of 2022, he was merely twenty-one (21) years of age.

It is the sincere desire that this Honorable Court will examine Mr. Ramyard's "human failings" along with the other aspects of his life, and find that the sentence to be imposed in this case should run concurrently with the ninety-seven (97) month sentence of imprisonment imposed on December 12, 2023 in the Middle District of Florida (Orlando Division) in the case entitled *United States v. Zachary Ramyard*, bearing Case No. 6:23-CR-00089-RBD-DCI-1. [D.E. 75]

It is additionally requested that this Court consider the significant factors brought out in the Psychological Evaluation Report of Michael J. DiTomasso, Ph.D. while fashioning the appropriate sentence in this case.

## PROCEDURAL BACKGROUND

1. On October 31, 2024, Zachary Kameron Ramyard pled guilty to Count 1 of the Indictment which charges conspiracy to commit wire fraud, in violation of 18 U.S.C. § 1349. [D.E. 14]

2. The Presentence Investigation Report provides at paragraph 102 as follows: "Based upon a total offense level of 31 and a criminal history category of I, the guideline imprisonment range is 108 to 135 months." [D.E. 23]. However, that guideline calculation is the result of various scrivener's errors in the Presentence Investigation Report.

Further, paragraph 103 of the PSR provides, *"Pursuant to § 5Gl.3(d), in any other case involving an undischarged term of imprisonment, the sentence for the instant offense may be*

*imposed to run concurrently, partially concurrently, or consecutively to the prior undischarged term of imprisonment to achieve a reasonable punishment for the instant offense."*

3. The Defendant has filed Objections to the Presentence Investigation Report, therein objecting to the loss amount and asserting that the loss amount should read more than $550,000 and no more than $1,500,000, resulting in a 14-level increase under Guidelines Section 2B 1.1(b)(1)(H); that the Defendant should not receive the two (2) level enhancement for sophisticated means, and asserting that although, U.S.S.G. §4A1.2(d)(2)(B) assigns one (1) criminal history point under §4A1.1(c) for each adult or juvenile sentence imposed within five years of the defendant's commencement of the instant offense not covered in subparagraph (A), such application of that one (1) additional criminal history point would result in a gross overstatement of the Defendant's criminal history. The Objections conclude that the appropriate advisory guidelines sentence range should read as follows: Based on a *total offense level of 25* and a criminal history category of II, the *advisory guideline imprisonment range* is **63 to 78 months**. [D.E. 25]

4. On March 3, 2025, the Government filed its response to the Defendant's objections, in-part agreeing that the loss amount should read more than $550,000 and no more than $1,500,000, resulting in a 14-level increase under Guidelines Section 2B 1.1(b)(1)(H). [D.E. 27]

5. The sentencing hearing is presently scheduled for Tuesday, March 25, 2025 at 9:30 a.m. [D.E. 26]

6. The within Motion for Downward Variance pursuant to the Title 18 U.S.C. §3553(a) Factors and for Concurrent Sentencing is submitted in the utmost of good faith and in the interest of justice.

## **TITLE 18 U.S.C. §3553(a) FACTORS THAT WARRANT CONSIDERATION**

Title 18 U.S.C. §3553(a)(1) provides that the court in determining the particular sentence to be imposed, shall consider "*the nature and circumstances of the offense and the history and characteristics of the defendant.*"

With regard to the history and characteristics of Mr. Ramyard, the Presentence Investigation Report more than adequately sets out his family history and personal information.

### *Departure or Variance Based Upon Zachary Kameron Ramyard's Serious Mental and Emotional Condition*

U.S.S.G. §5H1.3, entitled "Mental and Emotional Conditions," provides, "Mental and emotional conditions may be relevant in determining whether a departure is warranted, if such conditions, individually or in combination with other offender characteristics, are present to an unusual degree and distinguish the case from the typical cases covered by the guidelines."

On March 2, 2025, Michael J. DiTomasso, Ph.D. conducted a psychological evaluation upon Zachary Kameron Ramyard at FDC Miami. (*Dr. DiTomasso's full report is being filed under seal for this Court's review*.)

During that evaluation, Dr. DiTomasso conducted the following: the Clinical Interview; Telephone interview with client's mother and father; Beta-4 IQ Test; Symptom Checklist-90-R; Projective Sentence Completion Test, and the Wide Range Achievement Test, 5th Ed. Additionally, the doctor did a document review of the Indictment and the Presentence Investigation Report.

Dr. DiTomasso summarizes his findings as follows:

Zachary is a deeply troubled individual. He suffers from severe and chronic depression arising from a lifetime of rejection, derogation, isolation, and humiliation. At the emotional level,

4

Zachary is abjectly miserable, deeply frightened, and realistically worried about what his future will hold.

Zachary has learned to deal with the rejection, oppression, isolation, and raw aching sadness of his life through the use of intense levels of the psychological defense mechanism of repression. He shuts his eyes and his mind tightly against allowing the thoughts, feelings, and experiences that have tortured him for most of his life, to breach the surface of his conscious awareness. The emotional pain in his life led him to seek solace in substance abuse, which then became a disorder in its own right, and which then served to exacerbate the emotional distress and bad decision making that got him into trouble.  His chronic reliance on the excessive use of repression, and upon the brain-numbing effects of narcotics, are factors that drove this young man, who loves his family, who loves his daughter, and who has no wish to do harm to anyone; to go down the rabbit hole of patently self-destructive decisions that led to his present legal situation.

The doctor comments that it is not an excuse, but it is an explanation. After a lifetime of drowning in rejection and humiliation, Zachary stumbled onto an extraordinarily dysfunctional manner of trying to find some acceptance among his peers. It did not have to happen. If chance had allowed him to fall in with kinder, more compassionate peers, if his parents had figured out how bad his experiences were earlier on and done something about it, if he had found a way to feel that he belonged, that people liked him for who he was, he would not have chosen such a pathological path to finding his place in the community.

Dr. DiTomasso believes that it does not have to be this way in the future, and if justice can be tempered with mercy, and in view of some of the factors brought forth in his report, there could still be a light at the end of Zachary's tunnel.

It is the doctor's recommendation that as Zachary serves his sentence, he is given the opportunity to have psychiatric services and individual psychotherapy (which could address his substance abuse issues as well). Equally important is that some kind of vocational training be made available to Zachary, so that when he eventually gets out of prison, there will be a place in the world for him where he fits in.

The doctor opines that with healing for his mental health issues, with abstinence from drugs (which has already begun to benefit him) and with a marketable skill under his belt, Zachary could finally find the place for himself in the world that had eluded him in the past.

Therefore, Zachary respectfully requests this Court to take into consideration his mental and emotional difficulties while fashioning the appropriate sentence in this case.

### *Departure or Variance Based Upon Age (U.S.S.G. §5H1.1)*

It is important to note that in August of 2020, when the criminal conduct commenced, Zachary Ramyard had just turned nineteen (19) years of age, and when the criminal conduct concluded in August of 2022, he was merely twenty-one (21) years of age. Certainly, his youth, immaturity, naive trust in others, and entire lack of life experiences, surely contributed to his foolish decision to become involved in this wholly unacceptable criminal behavior.

The United States Sentencing Commission has stated in-part in policy statement §5H1.1, that "Age (including youth) may be relevant in determining whether a departure is warranted, if considerations based on age, individually or in combination with other offender characteristics, are present to an unusual degree and distinguish the case from the typical cases covered by the guidelines."

The Southern District of Florida has found that a defendant's youth was relevant in determining whether a downward variance was warranted. In *United States v. Nicolas Mendoza*

6

*Zapata*, Case No. 15-CR-20193-MORENO (SDFL 2015), the Court stated that *"young people do stupid things,"* and granted a downward variance of 25% to a twenty-two (22) year old drug courier *in-part* as a result of the defendant's young age. The court stated, *"When you're 21, 22-years old, you really don't know enough and you do stupid things."*

It is respectfully submitted that a downward departure or variance is warranted based on Zachery Ramyard's youth and immaturity during the commission of the offense.

## **THE DEFENDANT'S REQUEST FOR CONCURRENT SENTENCING**

On December 12, 2023, Mr. Ramyard received a ninety-seven (97) month sentence of imprisonment in the Middle District of Florida (Orlando Division) in the case entitled *United States v. Zachary Ramyard*, bearing Case No. 6:23-CR-00089-RBD-DCI-1. [D.E. 75]. That sentence was imposed upon Mr. Ramyard's plea of guilty to the charge of Postal Robbery, in violation of 18 U.S.C. §§ 2114(a) and 2, pursuant to a Plea Agreement. [D.E. 55]

● **The offense conduct upon which that guilty plea was based was in-part as follows [D.E. 70]:**

> On March 7, 2022, the United States Postal Inspection Service (USPIS) was notified at approximately 1:20 p.m. that a United States Postal Service (USPS) mail carrier (the victim) had just been robbed at an apartment complex located on Walden Circle, Orlando, Florida (apartment complex 1). The victim was on duty in his USPS issued uniform, delivering mail to the residents of apartment complex 1. The victim suffered a concussion, a scalp hematoma, and had to be intubated as a result of the injuries he sustained during the robbery. This robbery is hereinafter referred to as the "mail carrier robbery." (Mr. Ramyard was not one of the robbers.)
>
> On March 25, 2022, mail was stolen from four communities in Orlando, Florida (collectively, the "target communities"). Each of the target communities is located less than two miles from apartment complex 1, where the mail carrier robbery occurred. The arrow key stolen during the mail carrier robbery is capable of opening the mailboxes in the target communities.
>
> The investigation of the mail carrier robbery resulted in the identification of Jesus Rafael Rojas (Rojas) and Camilo Ignacio Vivas Sanchez (Sanchez) as the two

robbers. Information obtained from sources revealed that Rojas was involved with stolen checks, and he offered people money to use their bank accounts to deposit the stolen checks. Sources further informed that Rojas worked with an individual known as "Benzo," who was involved in altering stolen checks. A review of J.B.'s Instagram account revealed numerous pictures and videos suggesting that J.B. was likely involved in fraud. Specifically, images showed J.B. with substantial amounts of cash and jewelry. Other images showed numerous debit cards and identification cards. Images also showed that J.B. tried to recruit individuals for the use of their bank accounts. Law enforcement took that message to mean that J.B. was trying to recruit individuals who wanted to make a significant amount of fast cash for the use of their bank account.

Through the investigation it was determined that the cell phone number associated with J.B.'s Instagram account was in communication with Zachary Ramyard's (Ramyard) cell phone number. Law enforcement reviewed text messages between J.B. and Ramyard that occurred before the mail carrier robbery. Amongst those messages were conversations regarding personal identifying information, including information for bank accounts that received altered check deposits.[1]

Post-arrest, Rojas[2] informed that he and Sanchez were recruited by J.B. to rob the mail carrier and steal a USPS arrow key. Rojas added that after the mail carrier robbery he and Sanchez met J.B. and exchanged the arrow key for $1,000 to each of them. Rojas added that he learned J.B. gave the arrow key to Ramyard later that same day. Based on the above, Ramyard organized the mail carrier robbery of the arrow key on March 7, 2022, as evidenced by messages Ramyard sent to J.B. telling him to rob a mail carrier and paying him $5,000. In turn, J.B. recruited Rojas and Sanchez, who committed the mail carrier robbery and were each paid by J.B. The object of the offense was to obtain the arrow key and later use the key to steal mail from various mailbox locations. Other co-conspirators then altered and deposited stolen checks into various bank accounts.

● **According to the Factual Proffer the offense conduct upon which Mr. Ramyard's guilty plea is based in this case is as follows [D.E. 15]:**

*From in or around August 2020 through in or around August 2022*, the defendant agreed with co-conspirators to submit fraudulent Unemployment Insurance (UI) claims to the State of California, the Employment Development Department (EDD), on behalf of dozens of individuals without their authorization. To do so, the defendant purchased their personal identifiable information ("PII") online and used

---

[1] J.B. sent Ramyard personal identifying information for the following individuals: E.G. on February 16, 2022; I.E. on February 12, 2022; and S.G. on February 22, 2022. Bank records showed that accounts belonging to each of these three individuals received deposits of altered checks in late February 2022.

[2] Rojas informed knowing Ramyard by the alias of "Z". In text conversations between Rojas and J.B., Ramyard is also referenced by the alias of "Zee" by J.B.

burner phones to disguise his identity when communicating with co-conspirators and submitting the electronic applications. The defendant created new contact email addresses to submit and track fraudulent applications, including drjohn3900@yahoo.com. In order to verify the fraudulent applications with ID.me, the defendant and co-conspirators created counterfeit driver's licenses with victims' PII and the faces of Co-Conspirator 1 and other co-conspirators. In turn, the defendant instructed Co-Conspirator 1, a Miami-Dade County resident, to take selfie photographs of himself to match the counterfeit driver's licenses. The fraudulent UI claims triggered interstate wires to EDD and caused Bank of America to mail debit cards to Florida and California addresses controlled by the defendant and co-conspirators. As a result of 68 of the defendant's fraudulent applications in different victims' names, the California EDD deposited $1,288,500 in UI claims onto fraudulent debit cards controlled by the defendant and co-conspirators. The defendant used rental cars to travel throughout Florida to different ATMs to withdraw hundreds of thousands of dollars in UI funds from various debit cards.

## **Argument for a Concurrent Sentence**

First, it should be noted that the offense conduct in the case-at-bar occurred "*From in or around August 2020 through in or around August 2022,*" which encompasses the same time span as that in Mr. Ramyard's prior conviction and sentence in the Middle District of Florida.

Second, it is clear that the conduct in this case was the manner in which the fruits of the conspirator's criminal conduct in the Middle District case were ultimately realized. In other words, the theft of mail with its enclosed personal information by itself was of no value. It was only after that personal information was utilized to obtain money through mail fraud or otherwise, that there was value in the theft of the mail.

Third, the fraudulent conduct in this case was part-and-parcel of the overall scheme to benefit from the theft of the mail facilitated by the theft of the arrow key from the mailman which was part of the offense conduct in the Middle District.

U.S.S.G. §5G1.3 provides in-part:

(b) If subsection (a) does not apply, and a term of imprisonment resulted from another offense that is *relevant conduct to the instant offense of conviction* under the provisions of subsections (a)(1), (a)(2), or (a)(3) of §1B1.3 (Relevant Conduct),

the sentence for the instant offense shall be imposed as follows: (Emphasis supplied.)

(1) the court shall adjust the sentence for any period of imprisonment already served on the undischarged term of imprisonment if the court determines that such period of imprisonment will not be credited to the federal sentence by the Bureau of Prisons; and

(2) *the sentence for the instant offense shall be imposed to run concurrently to the remainder of the undischarged term of imprisonment.* (Emphasis supplied.)

(d) (Policy Statement) *In any other case involving an undischarged term of imprisonment, the sentence for the instant offense may be imposed to run concurrently, partially concurrently, or consecutively to the prior undischarged term of imprisonment to achieve a reasonable punishment for the instant offense.*(Emphasis supplied.)

The offense conduct in the case-at-bar had essentially been subsumed by the offense conduct in the Middle District case and may be considered as relevant conduct in that Middle District case.

Therefore, it would be appropriate to run the sentence to be imposed in this case concurrently with the ninety-seven (97) month sentence of imprisonment previously imposed in the Middle District of Florida.

### *The Need for Individualized Sentencing*

The United States Supreme Court in *Pepper v. United States,* 131 S.Ct. 1229 (2011), emphasized the need for individualized sentencing based not only on the crime, but on the particular defendant as well. They said that Federal sentencing demands that every convicted person be treated as an individual and "every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and punishment to ensue." Citing: *Gall v. United States*, 128 S.Ct. 586, 589 (2007).

As this Honorable Court is well-aware, the Court has full authority to consider any evidence in deciding whether the Guidelines "properly reflect §3553(a) considerations." *Rita v. United States,* 551 U.S. 338, 351 (2007).

The Supreme Court has expressly directed sentencing courts that they may not presume that the guidelines range is reasonable. *Gall v. United States,* 128 S. Ct. 586 (2007). Rather, sentencing courts are directed to make an "individualized assessment" of the sentence warranted by §3553(a) "based on the facts presented." *Gall v. United States,* 128 S. Ct. at 597 (2007). The result is that "[a] sentencing judge has very wide latitude to decide the proper degree of punishment for an individual offender and a particular crime." *United States v. Cavera*, 550 F.3d 180, 188 (2d Cir. 2008). Ultimately, courts are required to impose a sentence that is "sufficient, but not greater than necessary" to reflect the seriousness of the offense, promote general and specific deterrence, rehabilitate the defendant, and protect the public. 18 U.S.C. §3553(a).

## **CONCLUSION**

It is respectfully submitted that there is a well-founded basis upon which this Court may grant Mr. Ramyard's request for a concurrent sentence.  That sentence will reflect the seriousness of the offense; promote respect for the law, and provide just punishment for the offense.

Additionally, such a sentence would afford a more than adequate deterrence to any future criminal conduct of Mr. Ramyard and protect the public as well.  In sum and substance, such a sentence would be in accord with the principles set forth in Title 18 U.S.C. §3553.

In fashioning the appropriate sentence, the Court "may not presume that the Guidelines range is reasonable," but rather "must make an individualized assessment based on the facts presented." *Gall v. United States*, 552 U.S. 38, 50 (2007); see also *Nelson v. United States*, 555 U.S. 350, 352 (2009) ("The Guidelines are not only not mandatory on sentencing courts; they are

also not to be presumed reasonable.") Here, an individualized assessment of the § 3553(a) factors supports a concurrent sentence.

Lastly, it is respectfully submitted that Zachary Kameron Ramyard, who is presently twenty-three (23) years of age, deserves another chance to be a productive law-abiding member of society at the earliest time possible. Again, the Defendant has extraordinary remorse for his criminal conduct and has expressed a sincere desire to return to a life of only lawful hard work and respectability. The concurrent sentence requested in this instance would be sufficient, but not greater than necessary, to comply with the sentencing goals set forth in Title 18 U.S.C.A. §3553(2)(A-D).

**WHEREFORE**, Defendant, **ZACHARY KAMERON RAMYARD,** respectfully prays that this Honorable Court sentence him to a sentence that will run concurrently with the ninety-seven (97) month sentence of imprisonment previously imposed in the Middle District of Florida.

Respectfully submitted,

ANA M. DAVIDE, Esq.
(Florida Bar No. 875996)
ANA M. DAVIDE, P.A.
420 South Dixie Highway, Suite 4B
Coral Gables, Florida 33146
Telephone: (305) 854-6100
Fax: (305) 854-6197
E-mail: ana@anadavidelaw.com
(Counsel for Defendant,
*Zachary Kameron Ramyard*.)

/s/ **Ana M. Davide**
ANA M. DAVIDE

**CERTIFICATE OF SERVICE**

**I HEREBY CERTIFY** that on this 9th day of March, 2025, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF. I also certify that the foregoing

document is being served this day on all counsel of record or pro se parties either via transmission of Notices of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to receive electronically Notices of Electronic Filing.

> ANA M. DAVIDE, Esq.
> (Florida Bar No. 875996)
> ANA M. DAVIDE, P.A.
> 420 South Dixie Highway, Suite 4B
> Coral Gables, Florida 33146
> Telephone: (305) 854-6100
> Fax: (305) 854-6197
> E-mail: ana@anadavidelaw.com
> (Counsel for Defendant,
> *Zachary Kameron Ramyard*.)
>
> */s/  Ana M. Davide*  
> ANA M. DAVIDE